# CHARLESTON.

D. E. LUTZ v. J. E. WILLIAMS *et al.*

Submitted May 6, 1919.   Decided May 13, 1919.

1. JUDGMENT—*Res Judicata.*

   A cause of action between persons who were parties to a former adjudication, set up in a subsequent action between them, is not *res judicata* by the former decision, unless it is identical with the one actually or constructively heard and determined in the former suit.   (p. 217).

2. SAME—*Res Judicata—Identity of Issue.*

   A cause of action against a bank as the depositary of an agent in his individual capacity, is not identical with one against the same bank as the depositary of the principal of the same agent; wherefore judicial determination of the latter does not preclude an action for the former.   (p. 217).

3. SAME—*Res Judicata.*

   A reservation in a decree in such former adjudication, saying it shall not be construed to be an adjudication as to the title to the fund in question, except that it does not belong to the principal, saves the right to proceed against the bank as depositary of the agent.   (p. 217).

4.  BANKS AND BANKING—*Special Deposit—Appropriation by Bank.*

A bank to which a depositor owes a matured debt may appropriate his general deposit to payment of the debt; but it cannot so appropriate or apply a deposit made for a known special purpose, or under an agreement that the depositor may check it out for special purposes.  (p. 219).

5.  SAME.

An agreement inhibiting such appropriation need not be proved in any particular manner.  Evidence of the quality and quantity required for proof of any other parol agreement suffices.  (p. 224).

6.  SAME—*Special Deposit in Bank—Question for Jury.*

Direct and positive oral evidence of such an agreement, strongly sustained by admitted facts and circumstances, suffices to carry the issue as to its existence to the jury, notwithstanding slight contradictions and inconsistencies in the testimony of the depositor, relating to incidental transactions and attendant circumstances.  (p. 224).

7.  STIPULATIONS—*Construction—Fund in Litigation.*

A stipulation between the holder of a fund against which judgment creditors are proceeding by suggestion and such creditors, as to the amount of the fund, withdrawing that question from the litigation, is binding upon the parties, notwithstanding revelation by the evidence of ground of dispute as to a relatively small item included.  (p. 225).

8.  INTEREST—*Appropriation of Special Deposit.*

Wrongful appropriation by a bank of a special deposit, to payment of a debt due to it by the depositor, and its use of the money during the litigation over it, makes the bank liable for interest on the fund.  (p. 225).

9.  STIPULATION—*Fund Involved—Right to Interest.*

Failure of a stipulation as to the amount of the fund in controversy in such case, to provide for payment of interest, in the event of a result adverse to the bank, does not preclude right to a judgment for interest on the fund.  (p. 225).

Error to Circuit Court, Randolph County.

Action by D. E. Lutz against J. E. Williams and others. Judgment for plaintiff, and the People's National Bank of Elkins brings error.

*Affirmed.*

*W. B. & E. L. Maxwell* and *D. H. Hill Arnold,* for plaintiff in error.

*Samuel T. Spears,* and *A. M. Cunnigham,* for defendant in error.

POFFENBARGER, JUDGE:

The decision on the former writ of error in this case, reported in 79 W. Va., 609, reversed a judgment rendered on a verdict directed and found in favor of the Peoples National Bank of Elkins, in a proceeding against it by D. E. Lutz, a judgment creditor of J. E. Williams, on a suggestion founded upon an execution issued on a judgment; and condemned, as being unsound and untenable, several grounds of defense and all of the theories of right of recovery set up by the plaintiff, except one, namely, that of a special deposit of the fund in question by Williams, the debtor, making it available for satisfaction of the claims of the plaintiff and others similarly situated. This theory constituted the basis of the new trial resulting in a verdict for the plaintiff, on which judgment was rendered not only for him, but also for six other judgment creditors of Williams, under a stipulation filed in the case. To this judgment, the bank obtained a writ of error.

A decree entered in seven chancery causes heard together and pertaining to this fund was offered in support of a plea of former adjudication, but, in view of the character of the decree and the reservations therein made, the court held the matter set up in this case was not *res judicata* by that decree. When Williams' checks drawn against the fund in question were dishonored, Lutz and six other holders thereof brought separate chancery suits against the bank, to obtain said fund, upon the theory of agency in Williams for the Virginia Timber Company and title to that fund in his principal. All of them were matured and heard together and the theory on which they proceeded wholly failed, the court holding that the fund did not belong to the Virginia Timber Company, but that, on the contrary, it was money paid by that com-

pany to Williams for timber. Accordingly, it was held that the plaintiffs should take nothing by their several bills and that the bank recover its costs from them. Rights were reserved, however, to the extent and in the manner following: "But nothing herein contained shall be taken to prejudice the right of the plaintiffs to proceed against J. E. Williams for said debt.  *   *   *   *   *  It is further ordered that nothing herein shall be construed to be an adjudication as to the title or ownership of the funds in question in this suit, claimed to be in the hands of the said Peoples National Bank, except to decide that said fund is not owned by the said Virginia Timber Company." Of course, this decree amounts to an adjudication in favor of the bank, but the saving clause limits and defines the scope of that adjudication, for it is a part of the decree. The effect of a judgment or decree, like that of any other written instrument, is determinable by the language in which it is framed. As in any other case of interpretation, one clause, phrase or word may limit or restrain the effect of another. The adjudication in favor of the bank is qualified by a clause showing the extent to which it goes, namely, a decision against title in the Virginia Timber Company. Exoneration of the bank from liability, on the ground that it was not a mere depositary of that company, precludes the theory of exoneration on any other ground. The maxim, *Expressio unius est exclusio alterius,* applies. The trial court's decision as to the decree, however, was right for another reason. The cause of action first set up was against the bank in the capacity of depositary of the Virginia Timber Company. This action proceeds upon an entirely different basis. Its ground is that the bank is the depositary of J. E. Williams. It matters not that both Williams and the bank were parties to the chancery causes in which the decree was entered. What was involved in those suits is determinable by the ground of action set up in the bills, all of which were alike and all of which differed in respect of the ground of action set forth in them from the one stated in the declaration in this case. The present cause of action was not set up in

the chancery causes nor adjudicated in them. A cause of action between the parties to a former adjudication is not *res judicata,* unless it is identical with the one actually or constructively decided between them. *Bierne* v. *Ray,* 49 W. Va. 129; *Hudson* v. *Iguano Land & Mining Co.,* 71 W. Va. 402; *DeSollar* v. *Hanscome,* 158 U. S. 216; *Russell* v. *Place,* 94 U. S. 606; *Cromwell* v. *County of Sac,* 94 U. S. 351.

The evidence adduced on the former trial, tending to prove the fund in question to have been a special deposit, was deemed and held to be sufficient to carry the issue as to whether it was or not, to a jury for determination. The evidence as to the character of the deposit introduced on the second trial varies in some respects from that considered on the former writ of error, but the strength of its tendency to establish the plaintiff's case has not been materially impaired, if at all. Williams, of course, was the principal witness, and slight inconsistencies and contradictions in his testimony are invoked against its sufficiency to justify the giving of the instructions based upon it and sustain the verdict. He had been the agent of one Kelton, in extensive transactions in timber and had made himself liable to the bank for Kelton's indebtedness to it, in the sum of more than $5,500.00. After having incurred this indebtedness, he continued to transact business with the bank, in the handling of timber for other parties, particularly, the Virginia Timber Company. The Kelton failure had occurred in November 1909, and Williams' pass book introduced in evidence shows an account beginning December 26, 1909, but does not disclose any charge of the Kelton balance or indebtedness. From that date until June 30, 1910, he made several small deposits, against which his checks seem to have been honored. On June 30, 1910, he deposited a draft of the Virginia Timber Company for $640.00, and upon that occasion he says he entered into the agreement relied upon in this case, with D. V. Moyle, assistant cashier of the bank, who, he says, then wrote the words, "Pur Agent," after his name in the pass book. He says he told Moyle he was purchasing ties for the Virginia Timber Com-

pany, as their agent, that they were to send him money with which to pay for them, that he .wanted it entered in the bank as J. E. Williams, Purchasing Agent, and that all checks would be signed as such agent for the Virginia Timber Company. On July 23, 1910, he deposited another draft of the Virginia Timber Company for $374.92. On July 26, 1910, he made a deposit of $302.16, which he thinks came from that company also, but, as to that, he is not certain. Notwithstanding his heavy indebtedness to the bank, his checks against these deposits were honored. Another draft of the timber company for $1,247.06, substantially the amount in controversy here, was deposited for collection, August 4, 1910. When the deposit was made, Williams did not produce his pass book, to have the entry made in it, wherefore he was given a receipt for the amount of the draft, and a memorandum was filed in the bank. He says Lingamfelter, the cashier, who took the draft and gave the receipt therefor, requested him, in view of the magnitude of the amount, not to draw checks against it until after notification of its payment. Lingamfelter admits this. At this time, Williams had a balance of $350.00, and he drew some checks which could not be paid out of that balance, before he was notified that the large draft had been honored. His check in favor of Lutz for $481.20 bears date of August 5, 1910, and the following were drawn on August 6: Fenner Hart $106.04, William Batten $70.00, Crawford and Yothers, $31.09, and E. D. Nelson $94.22. Those drawn in favor of Hart and Batten were paid. On August 13, the following checks were drawn: J. H. West Lumber Company, $81.00, G. A. Goodwin, $201.76, M. L. Osborne, $177.84, D. E. Lutz and Company, $241.67, and F. J. Reed, $64.00. On August 10, Williams made two deposits amounting to $226.46, but he had three outstanding checks amounting to $606.51, drawn since the date of the deposit of the large draft. One of these, the D. E. Lutz check for $481.20, was not presented for payment until August 16. Williams says the Hart and Batten checks were handed to the payees personally, they happening to be in the city, and that

the others were mailed to the payees on the dates on which they were drawn. Lutz expresses the opinion that his was not mailed immediately, and, according to his testimony, it was· sent to his office at Mill Creek. Hart and Batten were evidently paid out of the two deposits made on the 10th, the $350.00 balance of the 4th having been reduced to $13.77, on the 9th. The bank received notice by mail, on the morning of August 12, that the large draft had been honored. On that day and before the bank opened, a meeting of the directors was held at which it was ordered that the amount of the draft be applied on Williams' check to the cashier for $1,485.00, dated, November 9, 1909, constituting part of the indebtedness growing out of the transaction with Kelton. Whether he was notified of this action on that day or not, he swears he issued the checks of that date, before he was notified. He also swears that, on the morning of August 12, Moyle, the assistant cashier, told him on the street that the draft had been honored and he was at liberty to draw checks against it. This, Moyle denies. As to the date and circumstances of this alleged transaction or conversation, Williams' testimony is somewhat contradictory. In his testimony on the former trial, he had given August 10th as the date thereof. In his testimony given in the chancery cause, he stated that he had met Moyle in the evening going from the bank to his residence. On this trial, after having ascertained that the bank received notice of payment, on the morning of the 12th, he admits that he may have been in error as to the exact time, in his former testimony, but he swears positively that he met Moyle on the street and was advised by him that he was at liberty to· draw checks against the draft, and that he did so before he received notice of the application of the amount of the. draft to the old check of $1,485.00. Moyle's denial is somewhat argumentative. In support of it, he invokes improbability of the transaction from the fact that he received notice of the payment of the draft, only on the morning of the 12th., and that, on that day, the application to the old debt had been made. Williams, however, admitting possibility of mistake in his former testimony as to the exact date

and circumstances, swears positively that he had such a conversation with, Moyle on the street, before he drew the checks bearing date, August 12, and further that he sometimes met Moyle on the street, coming from the bank, and before banking hours. There is conflict in the evidence concerning the alleged agreement as to the form of the account, or pass-book, also. Both Lingamfelter and Moyle admit that the handwriting of the memorandum on the pass-book, "Pur. Agt.," looks like that of Moyle. Lingamfelter says he thinks it is his. Moyle denies any recollection of having written it, but does not deny similarity of the handwriting to his own. He says Lingamfelter made up the book, but that the memorandum seems to have been put on afterwards. Nearly all of the checks drawn by Williams bear the addition or letters "P. A." after his signatures. It seems that all of those given for ties and timber are signed in that way. He swears in this case he told Lingamfeltér, at the time of the deposit of the large draft, he wanted to check against it for ties and timber, but, on cross-examination, he is made to admit that he had made an apparently contrary statement, in his testimony in the chancery causes. On redirect examination, he explains this by saying it related only to the memorandum on the pass-book, as to the capacity in which he carried the account, and not to the use of the fund in question.

It is hardly necessary to say the questions of credibility and veracity arising out of this mass of testimony fall within the province of the jury, unless they are governed and disposed of by some controlling fact admitted or conclusively established by the evidence. Nothing of that kind is perceived. Williams' testimony as to the character of his account is not limited to the one draft of $1,247.06. It goes back to June 30, 1910, and includes all deposits of checks and drafts on account of purchases of timber after that date, and it finds very strong support in the admitted conduct of the bank and its officials, with reference to his account and deposits of that kind. He swears that he knew his financial condi-

tion and his contemplated sources of money for deposit; and they did, for his principal in former transaction had failed, and in his failure had involved him in large indebtedness to the bank. They also knew his lilability for this indebtedness was bitterly disputed. From December, 1909, until June 30, 1910, he had carried a small checking account, in which the old indebtedness had not been charged up. On June 30 or July 1, he deposited his first draft of the Virginia Timber Company, $640.00, and it was on that date, he claims, that the bank agreed with him, through its cashier and assistant cashier, to permit him to make such deposits and check against them, and changed the character of his account from that of J. E. Williams, to J. E. Williams, Purchasing Agent. Checks against that deposit and other similar ones were honored by the bank, notwithstanding the existence of the old indebtedness. Although, after notice not to draw checks against the large deposit of August 4, until after notification of payment of the draft, he drew several checks, including the one in favor of Lutz, before he was notified of the payment of the draft, he no doubt had absolute confidence in the financial ability and the integrity of the drawer and felt that he could safely check against the deposit, even though some of his checks might be presented before notice of payment of the draft. According to his testimony, the only condition of payment of his checks was payment of the draft he had deposited, and, having full confidence in the integrity of the deposit, he may have felt that the possibililty of slight delay in the payment of his checks was not a matter of serious consequence. The informal understanding between him and Lingamfelter may have meant no more than notice that his draft had been honored. That would not be an unfair interpretation of it, and, so interpreted, it did not forbid the drawing of the checks. Having a balance of $350.00 and other money in prospect, which came in on the 10th, and having deposited a good draft of $1,247.06, he may have thought he had made reasonable provision for the checks, and the circumstance relied upon, namely, the drawing of checks for

$782.65, in addition to some already out, is not sufficient to preclude the jury from passing upon the direct and circumstantial evidence tending to prove the agreement claimed. It is not wholly nor vitally inconsistent with the oral evidence of the agreement. Nor is the fact that he drew some small checks against these deposits for other purposes than payment for timber. He says his commissions included in the payments to him were sufficient to provide for such checks. The evidence warranted the finding that all his deposits and checks of considerable size were on account of timber. He was induced to say, on cross-examination, that the account was a general checking account, but that verbal characterization of it is not conclusive. It must be considered in the light of all other evidence.

Some small and unexplained deposits which may have been timber money and probably were and the drawing of a few small checks for purposes other than payment for timber are not conclusive, nor do they make the deposits in question general in the sense of lilability to appropriation or set-off, in violation of the bank's agreement. The issues here are not matters of technical definition, accounting or bookkeeping. The first inquiry is whether there was an agreement, possibly contrary to the form of the account, and the second, whether the bank shall be required to comply with its agreement. The former is one for jury determination, and nothing in the policy of the law absolves a national bank or another kind of bank from the obligation of such an agreement. Authorities cited in the opinion delivered in the former decision in this court amply sustain both propositions. They also define the character of the evidence requisite to the establishment of such an agreement, in accordance with the rule enunciated in that opinion. The agreement need not be formal or specific. In kind and qualilty, the evidence may be such as suffices to establish any other agreement. Here we have direct and positive evidence of a specific agreement, supported by strongly probative circumstances.

The four instructions given for the plaintiff do not de-

part in any material respect from the legal principle governing the case. It is said two of them assume that the Lutz check was part of the deposited draft, but a close scrutiny of their terms does not reveal anything of the kind. It is charged that another, No. 4, propounds the theory that the deposit was specially set apart for payment of certan checks, and that it was improperly given because there was no evidence to sustain that theory. Williams swears he told the cashier it was to be used in payment for timber and the latter does not deny it. All of the checks in question were timber checks. The criticism of the remaining one is based largely on Williams' definition of the account, to which reference has been made. Whether the deposit was special does not depend wholly upon that. The other evidence justified the giving of the instruction. The modification of defendant's instruction No. 4, so as to put in the element of consent, as an essential requirement of authority in the bank to convert a special deposit into a general one, was clearly proper. To have given it without such modification would have been erroneous.

The stipulation under which judgment was rendered for the seven creditors proceeding by suggestion against the fund, on the final determination in this case, of the issue as to right to charge it, expressly provided for such judgment. The entry thereof was made the subject of an assignment of error, but it seems to have been abandoned.

It is insisted, however, that the judgment departed from the stipulation, or violated it, in respect to two matters, the amount of the fund and allowance of interest thereon. The stipulation fixes the amount of the fund at $1372.90, by inclusion of the small balance of $126.46 due Williams at the date of notice of payment of the draft. The stipulation effectively removed the question of the amount of the fund from the arena of combat. But for it, the amount included in the agreement between the bank and Williams might have been an issue in the trial and the jury might have found either way as to the small balance. As the bank took the fund in ques-

tion and used it in violation of the agreement and did not hold it as a trust fund subject to the order of the court, it was properly chargeable with interest thereon, unless the stipulation excluded interest. *Shank* v. *Groff,* 45 W. Va. 543; *Thompson* v. *Lyon,* 40 W. Va. 97; *McVeigh* v. *Howard,* 87 Va. 599; *Hatcher* v. *Lewis,* 4 Rand. 157; *Jones* v. *Williams,* 2 Call 106. Allowance of interest is not precluded by the stipulation. As to interest, it is silent. The fund was in liltigation in the chancery causes, but those causes were defeated, in them. Since August 12, 1910, the bank has had the use of the money and the status of the fund was not altered by any procedure.

Perceiving no error in the judgment, we will affirm it.

*Affirmed.*